JOHN C. CRUDEN
Acting Assistant Attorney General
Environment & Natural Resources Division

MICHAEL C. AUGUSTINI (DC Bar No. 452526)
michael.augustini@usdoj.gov
MEREDITH WEINBERG (VA Bar No. 47516)
meredith.weinberg@usdoj.gov
MARTHA C. MANN (FL Bar No. 155950)
martha.mann@usdoj.gov
ADAM J. KATZ (DC Bar No. 502776)
adam.katz@usdoj.gov
Environmental Defense Section
U.S. Department of Justice
P.O. Box 23986
Washington, DC 20026-3986
Telephone:  (202) 616-6519
Facsimile:  (202) 514-8865

Attorneys for Defendant United States of America

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEADFAST INSURANCE CO., <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA et al., <br><br> Defendants. <br>_____ <br> AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, <br><br> Plaintiff-Intervenor | No: CV-06-4686 AHM (RZx) <br><br> **DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Hearing: July 13, 2009 <br> Time: 10:00 a.m. <br> Place: Courtroom 14 <br> Judge: Hon. A. Howard Matz |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STATUTORY AND REGULATORY BACKGROUND  . . . . . . . . . . . . 3

IV.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

V.      ARGUMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    Whittaker was the Operator of the Whittaker-Bermite Site . . . . . . . 6

              1.  Whittaker Performed and Managed all Waste Disposal
                  Activities at the Whittaker-Bermite Site  . . . . . . . . . . . . . . . . . 6

                     a.  Whittaker Controlled Waste Disposal at the
                         "Burn Pit" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

                     b.  Whittaker Controlled Waste Disposal at the
                         "Hog-Out" Area  . . . . . . . . . . . . . . . . . . . . . . . . . . 9

                     c.  Whittaker Controlled the Disposal
                         of Wastewater at the Whittaker-Bermite Site . . . . . . . . . 10

                     d.  Whittaker Performed and Directed Improper
                         Waste Disposal at the Whittaker-Bermite Site . . . . . . . . 11

                     e.  Evidence From Whittaker's Closure of the
                         Whittaker-Bermite Site and Post-Closure
                         Investigations Shows That Whittaker Alone
                         Performed and Managed Waste Disposal at the
                         Whittaker-Bermite Site  . . . . . . . . . . . . . . . . . . . . . . 12

              2.  Performance and Managerial Control of Waste Disposal
                  was Only One Aspect of Whittaker's Overall Day-to-Day

Management of the Whittaker-Bermite Site . . . . . . . . . . . . . . . . 13

B.   The Presence of United States Inspectors at the Whittaker-

Bermite Site Does Not Make the United States an Operator . . . . . . 15

VI.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# TABLE OF AUTHORITIES

## CASES

Atlanta Gas Light Co. v. UGI Utils., Inc.,
  2005 WL 5660476 (M.D. Fla. Mar. 22, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Castaic Lake Water Auth. v. Whittaker Corp.,
  272 F. Supp. 2d 1053 (C.D. Cal. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Cleary v. News Corp.,
  30 F.3d 1255 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4,5

Eagle-Picher Indus., Inc. v. EPA,
  759 F.2d 922 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Emeryville v. Elementis Pigments, Inc.,
  2001 WL 964230 (N.D. Cal. Mar. 6, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Herman & MacLean v. Huddleston,
  459 U.S. 375 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Lewis Operating Corp. v. United States,
  533 F. Supp. 2d 1041 (C.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Lincoln Props. Ltd. v. Higgins,
  823 F. Supp. 1528 (E.D. Cal. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Trust,
  32 F.3d 1364 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Maxus Energy Corp. v. United States,
  898 F. Supp. 399 (N.D. Tex. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

Miami-Dade County, Fla. v. United States,
  345 F. Supp. 2d 1319 (S.D. Fla. 2004) . . . . . . . . . . . . . . . . 6, 11, 12, 14, 15, 17

Minyard Enters. v. Se. Chem. & Solvent Co.,
184 F.3d 373 (4th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

New Jersey Tpk. Auth. v. PPG Indus., Inc.,
197 F.3d 96 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Redevelopment Agency of Stockton v. Burlington N. and Santa Fe Ry. Corp.,
2007 WL 1793755 (E.D. Cal. June 19, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Rospatch Jessco Corp. v. Chrysler Corp.,
962 F. Supp. 998 (W.D. Mich. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Bestfoods,
524 U.S. 51 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 8, 9, 11, 18

United States v. Vertac Chem. Corp.,
46 F.3d 803 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17-18

Washington v. United States,
930 F. Supp. 474 (W.D. Wash. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Yankee Gas Servs. Co. v. UGI Utils., Inc.,
2009 WL 1456385 (MRK) (D. Conn. May 22, 2009) . . . . . . . . . . . . . . . . . . . . . 5

**STATUTES**

Comprehensive Environmental Response, Compensation and Liability Act,
42 U.S.C. § 9601 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. § 9607 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. § 9613 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. § 9607(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
42 U.S.C. § 9607(a)(1)-(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
42 U.S.C. § 9613(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Superfund Amendments and Reauthorization Act of 1986,

Pub. L. No. 99-499, 100 Stat. 1613 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**RULES**

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Fed. R. Civ. P. 56(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.   **INTRODUCTION**

This case involves claims brought by American International Specialty Lines Insurance Company ("AISLIC") for response costs incurred under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f), related to perchlorate contamination at the Whittaker-Bermite facility in Santa Clarita, California (the "Whittaker-Bermite Site"). [Undisp. Facts 1-2].  This Court already has adjudicated AISLIC's insured, Whittaker Corporation ("Whittaker"), as a liable party under CERCLA. <u>See</u> <u>Castaic Lake Water Authority v. Whittaker Corp.</u>, 272 F. Supp. 2d 1053 (C.D. Cal. 2003).  Here, AISLIC alleges that the United States is liable under CERCLA as a former owner, operator, and arranger at the Whittaker-Bermite Site by virtue of Whittaker's manufacture of munitions for the United States and/or private prime contractors at the Whittaker-Bermite Site.

As discussed in detail below, the Court should grant summary judgment for the United States on Whittaker's operator claims.[1]  Whittaker alone was responsible for all operations at the Whittaker-Bermite Site, including operations relating to waste disposal, as made clear by the testimony of Whittaker's key managers.  For instance, Douglas Moore, Whittaker's President, summarized his job duties as being "responsible to Whittaker for the operation of that site," testifying further that Bermite was responsible for dealing with waste disposal. [Undisp. Fact 7].  Further, James Card, Whittaker's Senior Contract Administrator (who dealt with the United States on a frequent basis), testified:  "On a day-to-day

---

[1]   AISLIC's complaint also contains counts alleging that the United States is liable as an "owner" and "arranger" under CERCLA, but the United States is not moving for summary judgment on those counts.  The United States denies liability on all counts, but contends that there are material facts in dispute regarding AISLIC's owner and arranger allegations.

basis, Bermite division, Whittaker Corporation operated that Whittaker-Bermite Site." [Undisp. Fact 7].  He also testified that Whittaker's "safety department were the ones that were responsible for the hazardous waste disposal."  [Undisp. Fact 7].  Similarly, Zoyd Luce, Whittaker's Safety Manager, testified that it was Whittaker personnel coordinated the hazardous waste program at the Whittaker-Bermite Site. [Undisp. Fact 8]

Based upon these and other uncontroverted facts discussed below, summary judgment for the United States should be granted on AISLIC's second claim for relief under CERCLA because the United States did not "operate" the Whittaker-Bermite Site as a matter of law.  Whittaker was responsible for and managed or directed all of the operations at the Whittaker-Bermite Site, including waste disposal.  Castaic Lake, 272 F. Supp. 2d at 1069 ("Whittaker owned and *operated* the site from 1967 to January, 1999) (emphasis added).

## II.   **FACTUAL BACKGROUND**

From approximately 1934 until 1942, the Whittaker-Bermite Site was occupied by facilities manufacturing explosive materials that used perchlorate, including fireworks.  [Undisp. Fact 3].  From 1942 to 1967, Bermite Powder Company ("Bermite") owned and operated the Whittaker-Bermite Site, manufacturing flares and other explosive materials.  [Undisp. Fact 4].  In 1967, Whittaker acquired Bermite[2] and conducted operations at the Whittaker-Bermite Site until approximately 1987, manufacturing items including flares for commercial use and rocket motors for the United States' military branches. [Undisp. Fact 5].  Whittaker was not forced to work on government contracts; Whittaker actively sought out federal work by submitting bids and freely negotiating government contracts.   [Undisp. Fact 6].

---

[2]      Hereafter, Whittaker and Bermite will be referred to collectively as "Whittaker."

1   Throughout the entire time that Bermite and Whittaker owned and

2   maintained manufacturing operations at the Whittaker-Bermite Site, those

3   companies performed and directed all operations involving the storage, handling,

4   use, and disposal of perchlorate, the alleged contaminant at issue in this lawsuit.[3]

## III.   STATUTORY AND REGULATORY BACKGROUND

6   Congress enacted CERCLA in 1980 to address the environmental and

7   public health effects associated with unsafe disposal of hazardous substances.[4]

8   See generally Eagle-Picher Indus., Inc. v. EPA, 759 F.2d 922, 925-26 (D.C. Cir.

9   1985).  CERCLA allows EPA, states, and other entities to recover their

10   appropriate cleanup "response" costs in a lawsuit against certain categories of

11   "covered persons," defined in Section 107(a) as:  (1) current owners and operators

12   of a facility at which there is a release or threatened release of a hazardous

13   substance; (2) persons who owned or operated the facility at the time of a

14   hazardous substance disposal; (3) persons who arranged for disposal or treatment

15   of a hazardous substance at the facility; or (4) persons who selected the facility

16   and transported hazardous substances to it.  42 U.S.C. § 9607(a)(1)-(4).[5]  These

17   "covered persons" are known as potentially responsible parties, or "PRPs."

18   CERCLA creates two different kinds of actions for the recovery of response

19   costs, i.e., a suit to recover costs solely under section 107 of CERCLA and a

20   _____

21   [3]   Perchlorate is a naturally occuring and manmade chemical that is used in the

22   manufacture of rocket propellant, explosives, fireworks, and flares.  See

23   <http://vm.cfsan.fda.gov/~dms/clo4qa.html>.

24   [4]   CERCLA was amended by the Superfund Amendments and Reauthorization

25   Act of 1986 ("SARA"), Pub. L. No. 99-499, 100 Stat. 1613 (1986).  References in this memorandum to CERCLA are to the statute as amended.

26   [5]   CERCLA defines many of its terms, including "facility," "hazardous

27   substance," "owner or operator," "person," "release," "transport," and "disposal." See 42 U.S.C. § 9601.

28

1  "contribution claim" governed by section 113 of CERCLA.  42 U.S.C. §§ 9607,

2  9613.  This is a contribution claim under section 113 of CERCLA.  See Order

3  regarding United States' Motion to Dismiss (Feb. 6, 2007) (stating that there is no

4  claim for joint and several liability in this case).

5      To establish the United States' liability under CERCLA in this case,

6  AISLIC must prove four basic elements:  (1) there has been a "release" or

7  "threatened release" of "hazardous substances" from the Whittaker-Bermite Site;

8  (2) the Whittaker-Bermite Site is a "facility"; (3) the release or threatened release

9  has caused incurrence of "response costs"; and (4) the United States is a covered

10  person responsible for the incurrence of those costs.  42 U.S.C. § 9607(a).

11  AISLIC must prove each of these elements by a preponderance of the evidence.

12  See Herman & MacLean v. Huddleston, 459 U.S. 375, 387 (1983); Minyard

13  Enters. v. Se. Chem. & Solvent Co., 184 F.3d 373, 385 (4th Cir. 1999); New

14  Jersey Tpk. Auth. v. PPG Indus., Inc., 197 F.3d 96, 103-04 (3d Cir. 1999).

15      Count Two of AISLIC's complaint asserts that the United States is liable as

16  an "operator" under CERCLA for the alleged perchlorate contamination at the

17  Whittaker-Bermite Site.  The undisputed facts in this case demonstrate that the

18  United States is not liable as an operator of the Whittaker-Bermite Site.

19  **IV.   STANDARD OF REVIEW**

20      Summary judgment is appropriate when there is no genuine issue of

21  material fact and, when viewing the evidence in the light most favorable to the

22  nonmoving party, the movant is clearly entitled to prevail as a matter of law.  See

23  Fed. R. Civ. P. 56(c); Cleary v. News Corp., 30 F.3d 1255, 1259 (9th Cir. 1994).

24  To survive a motion for summary judgment, the nonmoving party may not rest on

25  the mere allegations of its pleadings, but must set forth specific facts showing that

26  there is a genuine issue for trial.  See Fed R. Civ. P. 56(e); Celotex Corp. v.

27  Catrett, 477 U.S. 317, 324-26 (1986).  Moreover, if the nonmoving party has the

28

burden of proof on a given issue, the moving party can prevail by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.  In this case, AISLIC has the burden of proof to establish that the United States is a CERCLA operator.

## V.   **ARGUMENT**

The standard for CERCLA operator liability was clarified by the Supreme Court in United States v. Bestfoods, 524 U.S. 51 (1998).  The Court held that operator liability arises only if the party performed or managed the specific operations at a facility that gave rise to the contamination at issue:

> "[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility.  To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations *specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.*

Id. at 66-67 (emphasis added).

The Supreme Court made clear that it was not referring to theoretical or legal authority to exercise such control, but was focusing on whether such authority was in fact exercised in the particular case.  Id.  The undisputed evidence in this case shows that Whittaker conducted, managed, and directed all operations specifically related to pollution at the Whittaker-Bermite Site.  In contrast, the United States was simply a customer, and did not participate or direct waste disposal activities in any way.  See Yankee Gas Servs. Co. v. UGI Utils., Inc., 2009 WL 1456385, 3:06-cv-01369 (MRK), at *2 (D. Conn., May 22, 2009) (finding, under Bestfoods, a parent's provision of assistance to, and "careful" and "detailed" oversight of, its subsidiary's operations was "a far cry" from operator-type management, direction, and control).  Thus, there is no basis on which the United States could be held to be an operator, and this Court should grant the United States' motion for summary judgment on AISLIC's operator claim.

**A.**   **Whittaker was the Operator of the Whittaker-Bermite Site**

1.   <u>Whittaker Performed and Managed All Waste Disposal Activities at the Whittaker-Bermite Site</u>

At all times, Whittaker's waste disposal matters were managed, directed, and performed solely by Whittaker personnel.  Thus, Whittaker alone was the CERCLA operator of the Whittaker-Bermite Site.  <u>Bestfoods</u>, 524 U.S. at 66-67; <u>Miami-Dade County, Fla. v. United States</u>, 345 F. Supp. 2d 1319, 1342 (S.D. Fla. 2004) (concluding that the federal government was not an operator at a site where a military contractor repaired and overhauled aircraft engines for the United States, in part because federal personnel had no waste disposal duties at the site).

As set forth in detail below, the evidence in this case shows that Whittaker executives and employees had all hands-on management and performance-related duties relating to the creation and disposal of waste at the Whittaker-Bermite Site, pollution prevention and abatement measures at the Whittaker-Bermite Site, pollution cleanup actions at the Whittaker-Bermite Site, and decisions about compliance with environmental regulations at the Whittaker-Bermite Site.

The facts here demonstrate that Whittaker exercised full authority over procedures related to waste disposal in use at the Whittaker-Bermite Site.  As Whittaker's head of safety explained, Whittaker set up the waste program at the Site, and appointed a hazardous waste coordinator and environmental safety officer to manage the waste disposal program.  [Undisp. Fact 8].  Whittaker's contract administrator (who dealt with the United States on a frequent basis) confirmed that the safety department was in charge of creating and enforcing rules for the handling and disposal of waste at the Whittaker Bermite Site.  [Undisp. Fact 7].

To direct its employees on how to perform their waste disposal duties, Whittaker had in place its own environmental handbook, drafted by Whittaker and

approved by Whittaker management. [Undisp. Fact 9]. This handbook governed the specific methods and procedures for Whittaker's waste disposal activities at the Whittaker-Bermite Site, which were no different for Whittaker's waste disposal activities related to its private commercial contracts than they were for its waste disposal activities related to its government contracts. [Undisp. Facts 9-10]. Whittaker's work on those private commercial contracts resulted in the creation of perchlorate waste. [Undisp. Fact 12].

On a day-to-day basis, Whittaker personnel had "cradle to grave" responsibilities for the handling, storage, and ultimate disposal of perchlorate waste at the Whittaker-Bermite Site. [Undisp. Fact 11]. Whittaker's safety personnel were wholly responsible for collecting perchlorate waste created as a result of Whittaker's manufacturing operations, and then for the transportation of that perchlorate waste from production operations to disposal areas on the Whittaker-Bermite Site, in Whittaker-owned vehicles. [Undisp. Facts 13-14]. These same safety personnel were additionally responsible for supervising and performing all waste disposal activities at the Whittaker-Bermite Site, which included burning waste in a burn pit on the Site and disposing of wastewater in various sumps and ponds around the Whittaker-Bermite Site. [Undisp. Facts 20, 33].

Further, the responsibility for obtaining and maintaining permits for these waste disposal activities (including burning and collecting wastewater) fell to Whittaker safety personnel alone, as did the responsibility for ensuring that all perchlorate waste was handled and disposed of safely and in accordance with environmental laws and regulations. [Undisp. Facts 15-16].

At bottom, the undisputed facts concerning Whittaker's performance and day-to-day direction of operations specifically related to pollution - namely, disposal of hazardous waste and decision-making about compliance with

environmental regulations - leads to the inexorable conclusion that Whittaker was the sole CERCLA operator of the Whittaker-Bermite Site as a matter of law. Bestfoods, 524 U.S. at 66-67; see also Emeryville v. Elementis Pigments, Inc., 2001 WL 964230, No. 99-03719, at *6 (N.D. Cal. Mar. 6, 2001) (granting summary judgment to defendant on operator liability because there was no triable issue of fact as to "whether the City managed, directed or conducted operations specifically related to the pollution," where plaintiff could not cite any facts relating to defendant's involvement with drums that caused contamination on plaintiff's property).

Consideration of Whittaker's specific waste disposal practices further demonstrates the complete managerial control that Whittaker exercised over the pollution-causing activities at the Whittaker-Bermite Site.

a.    Whittaker Controlled Waste Disposal at the "Burn Pit"

During periods of active manufacturing operations, Whittaker operated a burn pit to dispose of waste generated from its manufacturing operations. [Undisp. Fact 17]. Whittaker safety personnel chose the location of the burn pit, and constructed (i.e., dug out) and maintained the burn pit themselves using Whittaker-owned earthmoving equipment. [Undisp. Fact 18]. As discussed below, Whittaker personnel alone performed and had the authority to supervise all burn pit-related activities.

Undisputed facts show that Whittaker personnel transported in Whittaker-owned trucks perchlorate waste from production buildings to the burn pit. [Undisp. Fact 14]. All evidence also demonstrates that Whittaker safety personnel decided how often to conduct burns in the burn pit, and were solely responsible for burning the perchlorate waste that they brought to the burn pit. [Undisp. Facts 19-20]. Moreover, Whittaker personnel had the responsibility to deal with all residual material left in the burn pit after Whittaker a burn. [Undisp. Fact 21]. These

1    factors demonstrate that Whittaker was an operator of the Whittaker-Bermite Site.

2    Bestfoods, 524 U.S. at 66-67; see also Lincoln Props. Ltd. v. Higgins, 823 F.

3    Supp. 1528, 1534 (E.D. Cal. 1992) (granting summary judgment to defendant on

4    operator liability because no evidence showed that it "participate[d] in the

5    operation of" sewer lines that contained PCE or "had authority to control" the PCE

6    waste in the sewer lines).

7              b.       Whittaker Controlled Waste Disposal at the "Hog-Out" Area

8         Whittaker personnel also conducted waste disposal activities at an area of

9    the Whittaker-Bermite Site known as the "hog-out" area, where Whittaker

10   personnel removed propellant containing perchlorate from faulty rocket motors

11   using a cutting tool and a high-pressure stream of water.  [Undisp. Facts 22-23].

12   Whittaker alone conducted and had supervisory authority over the hog-out

13   process, and it was Whittaker's responsibility to collect and dispose of all the

14   waste (including wastewater) created as a byproduct of the hog-out process.

15   [Undisp. Facts 24-25].

16        In exercising this responsibility, Whittaker allowed some hogged-out waste

17   to be released onto the ground at and around the hog-out area.  [Undisp. Fact 26].

18   In addition, Whittaker failed to adequately capture the wastewater from the hog-

19   out process, allowing it to run on the ground.  [Undisp. Fact 26].  All of these facts

20   lead to the conclusion that Whittaker was the operator of the Whittaker-Bermite

21   Site.  Bestfoods, 524 U.S. at 66-67; see also Redevelopment Agency of Stockton

22   v. Burlington N. and Santa Fe Ry. Corp., 2007 WL 1793755, No. Civ. S-05-02087

23   DFL JFL, at *5 (E.D. Cal., June 19, 2007) (railroad had no CERCLA operator

24   liability where there was no evidence that it "manage[d], directe[d] or conduct[ed]

25   operations specifically related to pollution" in connection with the perforated

26   drainage pipe through which contamination migrated onto plaintiff's property)

27   (quoting Bestfoods, 524 U.S. at 66).

28

c.      Whittaker Controlled the Disposal of Wastewater at the
        Whittaker-Bermite Site

Whittaker also performed and maintained total day-to-day management over the disposal of industrial wastewater at the Whittaker-Bermite Site.  Some of this wastewater was created as a result of Whittaker's housekeeping activities at the Site, which Whittaker was solely responsible for conducting and managing. [Undisp. Fact 27].  For instance, Whittaker performed and supervised the washing down of buildings and equipment used in its manufacturing operations.  [Undisp. Fact 28].  The wastewater that Whittaker created during its washdown activities contained perchlorate.  [Undisp. Fact 29].

Whittaker had the responsibility to collect and dispose of the wastewater it created at the Whittaker-Bermite Site, and at times, Whittaker allowed this wastewater to run onto the ground. [Undisp. Fact 30].  At other times, Whittaker utilized sumps and ponds that it had financed and built on the Whittaker-Bermite Site to collect the wastewater it created.  [Undisp. Facts 31-32].  Whittaker also used these sumps and ponds to dispose of perchlorate scrap created as byproduct of its manufacturing operations.  [Undisp. Fact 31].

Whittaker had full managerial control over the maintenance of its sumps and ponds at the Whittaker-Bermite Site.  [Undisp. Fact 33].  Whittaker's responsibilities in this regard included supervising and conducting the response to leaks, liner breaks, and overflows from the sumps and ponds so that waste discharged from its sumps and ponds did not damage the environment at and around the Whittaker-Bermite Site.  [Undisp. Fact 34].  Whittaker did not always comply with these responsibilities; at one point, Los Angeles County found that Whittaker violated its wastewater permit by failing to properly line its ponds. [Undisp. Fact 35].

1    These facts demonstrate that Whittaker was clearly an operator of the

2    Whittaker-Bermite Site. <u>Bestfoods</u>, 524 U.S. at 66-67; <u>Miami-Dade</u>, 345 F. Supp.

3    2d at 1345-46 (finding no operator liability, in part because the evidence failed to

4    establish that government inspected a pond in use on the site or had any

5    responsibilities concerning discharges into the pond).

6        d.    <u>Whittaker Performed and Directed Improper Waste Disposal at</u>

7              <u>the Whittaker-Bermite Site</u>

8    Under every contract Whittaker entered into with the United States, it was

9    clear that Whittaker had responsibility to comply with applicable environmental

10   law and regulations. [Undisp. Fact 36].  Yet evidence shows that Whittaker

11   performed and directed improper waste disposal activities at the Site.  For

12   example, Whittaker improperly dumped and buried waste across the Whittaker-

13   Bermite Site and, as discussed above, allowed wastewater to overflow and seep

14   through liner breaks in the sumps and ponds it had built on the Whittaker-Bermite

15   Site. [Undisp. Facts 30, 37-38].  In no way did the United States authorize, let

16   alone operate, these unlawful waste disposal activities.

17   Internal Whittaker memoranda regarding these improper waste disposal

18   practices undisputedly demonstrate that Whittaker management was aware that

19   Whittaker's improper waste disposal practices could be in violation of federal

20   waste disposal laws, and the United States was neither consulted about nor

21   provided copies of these memoranda. [Undisp. Fact 39].  Whittaker also

22   understood the environmental consequences of its improper waste disposal

23   practices, as it was expressly advised by its consulting geologist that there was

24   "almost certainly the potential for migration of hazardous waste or hazardous

25   waste constituents from the facility to surface water." [Undisp. Fact 40].  Again,

26   there is no evidence that the United States knew about or received a copy of this

27   report.

28

1    The evidence of Whittaker's mismanagement of waste disposal leads
2 directly to the conclusion that it was the CERCLA operator of the Whittaker-
3 Bermite Site. See Miami-Dade at 1346 (finding no evidence of operator liability,
4 in part because plaintiff knew that contamination was traveling off the site at
5 issue, but failed to consult the United States about the pollution problem); Maxus
6 Energy Corp. v. United States, 898 F. Supp. 399, 402 (N.D. Tex. 1995) (granting
7 summary judgment on operator liability, in part, because the plaintiff's "personnel,
8 who directed the manner of disposal of wastes at the [herbicide manufacturing
9 facility], did not consult United States personnel regarding such waste disposal.").

10    e.    Evidence from Whittaker's Closure of the Whittaker-Bermite
11          Site and Post-Closure Investigations Shows That Whittaker
12          Alone Performed and Managed Waste Disposal at the
13          Whittaker-Bermite Site

14    When Whittaker voluntarily ceased active manufacturing operations in
15 1987, Whittaker was wholly responsible for decontaminating and demolishing all
16 of the buildings at the Whittaker-Bermite Site in accordance with all applicable
17 laws. [Undisp. Fact 41]. At that time, Whittaker also sold the manufacturing
18 equipment it had used for operations at the Whittaker-Bermite Site. [Undisp.
19 Fact 42].

20    During its closure of the Whittaker-Bermite Site, Whittaker conducted and
21 supervised improper "cleanup" activities, which included further waste disposal at
22 the Whittaker-Bermite Site. Cf. Lewis Operating Corp. v. United States, 533 F.
23 Supp. 2d 1041, 1046 (C.D. Cal. 2007) (where a "landowner actively spreads
24 contaminated soil from one area of a development site to another...that landowner
25 has 'released' contaminants onto the land."). For instance, Whittaker personnel or
26 agents conducted and supervised a waste disposal process called "land farming,"
27 during which perchlorate-contaminated soil was dug up in certain areas of the

28

1  Whittaker-Bermite Site and placed on top of clean soil located in other areas of the
2  Whittaker-Bermite Site. [Undisp. Fact 43]. Whittaker personnel or agents also
3  dug up some waste that Whittaker had buried at the Whittaker-Bermite Site, and
4  then backfilled and mixed soil with the waste they had uncovered. [Undisp.
5  Fact 44].

6      After receiving an anonymous tip about Whittaker's improper waste
7  disposal activities during its closure of the Whittaker-Bermite Site, California
8  Department of Toxic Substances Control ("DTSC") staff began to investigate the
9  Whittaker-Bermite Site in the 1990s. [Undisp. Fact 45]. After a lengthy
10  investigation, DTSC found Whittaker to be in violation of various waste disposal
11  laws and regulations. [Undisp. Fact 46].

12      Whittaker's conduct and supervision of the waste disposal activities that
13  took place at the closure of the Whittaker-Bermite Site highlight its status as a
14  CERCLA operator. See generally Atlanta Gas Light Co. v. UGI Utils., Inc., 2005
15  WL 5660476, No. 3:03-cv-614-J-20MMH, at *7 (M.D. Fla. Mar. 22, 2005)
16  (granting summary judgment on operator liability, and finding that no reasonable
17  factfinder could conclude that evidence showed that the defendant parent company
18  managed or directed operations specifically related to the disposal of hazardous
19  waste or decisions about compliance with environmental regulations).

20      2.   Performance and Managerial Control of Waste Disposal was Only
21            One Aspect of Whittaker's Overall Day-to-Day Management of the
22            Whittaker-Bermite Site

23      In addition to being fully responsible for the execution of and managerial
24  control over waste disposal practices at the Whittaker-Bermite Site, Whittaker
25  personnel were responsible for conducting and managing all day-to-day
26  construction, maintenance, storage, transportation, safety, and manufacturing
27  operations at the Whittaker-Bermite Site, which created perchlorate waste in the

28

1  first place.  Thus, Whittaker is the operator of all activities at the Site that may

2  have resulted in perchlorate contamination.

3  Whittaker owned all of land that made up the Whittaker-Bermite Site, and

4  provided security for and controlled all access to the Whittaker-Bermite Site.

5  [Undisp. Facts 5, 47].  Whittaker also owned all of the buildings at the Whittaker-

6  Bermite Site, decided what each building would be used for, and maintained lock-

7  up responsibilities for each building.  [Undisp. Facts 48-49].  In addition,

8  Whittaker had all maintenance responsibilities for the buildings at the Whittaker-

9  Bermite Site, the equipment in each of the buildings, and the grounds outside of

10  the buildings.  [Undisp. Facts 48, 50-51].

11  Further, Whittaker's senior management, including the President and Vice

12  President of Operations, determined and controlled what products Whittaker

13  manufactured at the Whittaker-Bermite Site for the United States and other non-

14  government customers by freely negotiating contracts with these entities.  [Undisp.

15  Fact 6].  Whittaker determined what labor needs it had, and then hired, fired, and

16  managed all personnel at the Whittaker-Bermite Site.  [Undisp. Fact 52].

17  Whittaker also trained its employees on all safety and environmentally-related

18  issues.  [Undisp. Fact 53].  These details further demonstrate Whittaker's status as

19  the sole operator of the Whittaker-Bermite Site.  Cf. Miami-Dade, at 1342 (finding

20  that the government was not an operator, in part, because it was not involved in

21  hiring and firing employees or directing them in their daily work); Maxus, 898 F.

22  Supp. at 402 (granting summary judgment to the United States on operator

23  liability, in part, because the government did not hire, fire, or manage plaintiff's

24  employees involved in production processes).

25  Personnel hired by Whittaker were assigned to Whittaker's various

26  departments, each of which had responsibilities for operating the Whittaker-

27  Bermite Site.  For instance, Whittaker had a purchasing department responsible for

28

purchasing the raw materials, including perchlorate, that Whittaker used in its manufacturing operations. [Undisp. Fact 54]. Personnel in Whittaker's receiving department then received those raw materials, and Whittaker transportation personnel moved those materials from the receiving department to storage facilities at the Whittaker-Bermite Site. [Undisp. Fact 55]. Whittaker transportation personnel also moved the raw materials, including perchlorate, to the production areas at the Whittaker-Bermite Site, where Whittaker operations personnel alone conducted and had full supervisory authority over the performance of manufacturing operations in which the raw materials were used. [Undisp. Facts 56-57].

In sum, Whittaker had full responsibility for the control, direction, and management of day-to-day operations at the Whittaker-Bermite Site, and was thus the sole operator of the Whittaker-Bermite Site within the meaning of CERCLA. See Long Beach Unified School Dist. v. Dorothy B. Godwin Cal. Living Trust, 32 F.3d 1364, 1367 (9th Cir. 1994) (granting summary judgment on operator liability to owner of pipeline that crossed contaminated property, because pipeline owner did not "play an active role in running the facility, typically involving hands-on, day-to-day participation in the facility's management."); United States v. Vertac Chem. Corp., 46 F.3d 803, 808 (8th Cir. 1995) (where a chemical manufacturer produced Agent Orange during the Vietnam War pursuant to a military contract, the United States was not a CERCLA operator "because it did not exercise actual or substantial control over the operations at the . . . facility."); Miami-Dade, 345 F. Supp. 2d at 1342 (finding that the government was not an operator, in part, because it did not operate the work assembly line).

**B.      The Presence of United States Inspectors at the Whittaker-Bermite Site Does Not Make the United States an Operator**

AISLIC has alleged that there is a basis for the United States' operator liability because government inspectors were present on the Whittaker-Bermite Site. Complaint at ¶ 32. But the case law on this matter is clear: the presence of United States inspectors who worked at or visited the Whittaker-Bermite Site for the purpose of ensuring that the products Whittaker manufactured for the United States met specifications does not convert the United States into a CERCLA operator. See, e.g., Rospatch Jessco Corp. v. Chrysler Corp., 962 F. Supp. 998, 1006 (W.D. Mich. 1995).

The Rospatch decision is directly applicable to the facts here. In Rospatch, the court granted the United States' motion for summary judgment on plaintiff's CERCLA operator claim, rejecting the assertion that the United States operated a Michigan aircraft engine factory in the early 1950s. It was insufficient to establish operator status that the Air Force had many representatives at the plant during the installation of government-owned equipment, and kept a representative who worked out of an office at the plant during manufacturing operations. 962 F. Supp. at 1005. The Air Force did not get involved in the contractor's "management of its operations" or "management decisions," and the contractor was not forced into doing the work, but had sought out the work. The United States did not "involve[] itself in the manner of [the contractor's] production of the R-1300 engine, except inasmuch as the specifications mandated specific production methods." Id. at 1005-06. "[T]he mere presence of an Air Force representative at the . . . plant does not indicate that the Air Force interfered with the manner of [the contractor's] production of the engines since this representative merely monitored the quality control of the engines to ensure that they satisfied the contract specifications." Id. at 1006.

Here, it is undisputed that Whittaker agreed to provide the United States with a product that met quality standards laid out in government contracts.

1   [Undisp. Fact 58]. Accordingly, the United States had an interest in the quality of
2   the products that Whittaker delivered; it used visiting and resident inspection
3   personnel at the Whittaker-Bermite Site for the sole purpose of monitoring
4   Whittaker's contractual performance and ensuring that the products Whittaker
5   manufactured met the government's specifications. [Undisp. Fact 59]. Whittaker
6   had its own teams performing these same quality control functions. [Undisp.
7   Fact 60].

8          Whittaker's President, Douglas Moore, confirmed that the government
9   inspectors had no supervisory or management authority in Whittaker's operations,
10  testifying that the United States government had "no operational role, as I
11  understand 'operational' to mean. That's directing people on how to do
12  something. That was not their role." [Undisp. Fact 61]. As discussed above,
13  Whittaker personnel - not United States inspectors - conducted and managed day-
14  to-day procedures related to perchlorate waste disposal at the Whittaker-Bermite
15  Site: among other things, Whittaker purchased perchlorate for its manufacturing
16  operations; performed manufacturing operations that created perchlorate waste;
17  hogged-out rocket motors thereby creating perchlorate waste; instructed Whittaker
18  employees how to manage perchlorate waste; collected perchlorate waste and
19  wastewater; transported perchlorate waste; and burned perchlorate waste.
20  [Undisp. Facts 8, 9, 12, 14, 17, 22, 23, 31, 54].

21         Simply put, nothing in the record suggests that any of the government's on-
22  site representatives actively assisted Whittaker employees with or participated in
23  their decision-making process regarding waste disposal activities. Accordingly,
24  the United States cannot be found to be an operator of the Whittaker-Bermite Site.
25  See Miami Dade, 345 F. Supp. 2d at 1343 (holding the government was not liable
26  as an operator, in part, because it "had no objective, duty, or responsibility other
27  than to enforce the price, schedule, and other contract provisions by ensuring the

28

1   delivery of quality products in accordance with the terms of the contract and

2   otherwise protecting the interests of the federal government"); see also Vertac

3   Chem., 46 F.3d at 809 (no operator liability where federal personnel did not

4   manage or supervise the day-to-day activities and operations of the contractor's

5   personnel); Washington v. United States, 930 F. Supp. 474, 485 (W.D. Wash.

6   1996) (granting United States' motion for summary judgment on operator liability

7   where government inspectors were not responsible for directing or controlling

8   activities at shipyard that caused pollution; instead, "[t]he primary concern of the

9   inspectors . . . was efficiency and cost control.").

10  **VI.   CONCLUSION**

11      In sum, Whittaker exercised pervasive managerial control over all day-to-

12  day operations at the Whittaker-Bermite Site from the facility's inception to its

13  closure, and made all decisions regarding the handling and disposal of perchlorate

14  waste.  Further, Whittaker performed all waste disposal activities at the Whittaker-

15  Bermite Site.  AISLIC cannot cite any facts showing that the United States ever

16  "manage[d], direct[ed], or conduct[ed] [Whittaker] operations specifically related

17  to pollution, . . . operations having to do with the leakage or disposal of hazardous

18  waste, or decisions about compliance with environmental regulations." Bestfoods,

19  524 U.S. at 66-67.  The United States was not an operator of the Whittaker-

20  Bermite Site as a matter of law, and therefore, the Court should grant the United

21  States' motion for summary judgment on AISLIC's second claim for relief.

22

23                          Respectfully submitted,

24                          JOHN C. CRUDEN
                            Acting Assistant Attorney General
25

26  Dated: June 17, 2009

27                          MICHAEL C. AUGUSTINI
                            michael.augustini@usdoj.gov
28

MEREDITH WEINBERG
meredith.weinberg@usdoj.gov
MARTHA C. MANN
martha.mann@usdoj.gov
ADAM J. KATZ
adam.katz@usdoj.gov
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 23986
Washington, DC 20026-3986
Telephone:  (202) 616-6519
Facsimile:  (202) 514-8865

Attorneys for Defendant United States of America

# STEADFAST INSURANCE CO. v.

# UNITED STATES OF AMERICA et al.,

## Case No. CV 06-4686 AHM (RZx)

## PROOF OF SERVICE

I, Meredith Weinberg, the undersigned, hereby declare as follows:

1.      I am over the age of 18 years and am not a party to these cases.  I am a counsel of record in the above case.

2.      My business address is 601 D Street, NW, Suite 8000, Washington, D.C. 20004.

3.      On June 17, 2009, I electronically filed the foregoing "DEFENDANT UNITED STATES OF AMERICA'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT"  with the Clerk of the Court for the United States District Court for the Central District of California by using the CM/ECF System, which the parties have agreed is the equivalent of hand service

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  Executed on June 17 2009, at Washington, D.C.

By: *M Weinberg*

Meredith Weinberg
U.S. Department of Justice